# EXHIBIT 1

# STATE COURT COMPLAINT

**Electronically Filed**
**12/5/2023 8:03 AM**
**Steven D. Grierson**
**CLERK OF THE COURT**

COMPB
**MATTHEW L. SHARP, LTD.**
Matthew L. Sharp, Esq.
Nevada Bar No. 4746
432 Ridge St.
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

**NEWMAN FERRARA LLP**
Jeffrey M. Norton, Esq. (*Pro Hac Vice Forthcoming*)
Benjamin D. Baker, Esq. (*Pro Hac Vice Forthcoming*)
1250 Broadway, 27th Floor
New York, NY 10001
Tel: (212) 619-5400
Fax: (212) 619-3090
jnorton@nfllp.com
bbaker@nfllp.com

*Attorneys for Plaintiffs*

CASE NO: A-23-882774-B
Department 27

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| ADRIAN DOMINICAN SISTERS, SISTERS OF BON SECOURS USA, SISTERS OF ST. FRANCIS OF PHILADELPHIA, and SISTERS OF THE HOLY NAMES OF JESUS & MARY, U.S.-ONTARIO PROVINCE, derivatively on behalf of SMITH & WESSON BRANDS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARK P. SMITH, KEVIN A. MAXWELL, SUSAN J. CUPERO, ROBERT L. SCOTT, ANITA D. BRITT, FRED M. DIAZ, MICHELLE J. LOHMEIER, BARRY M. MONHEIT, and DENIS G. SUGGS, <br><br> Defendants. <br><br> -and- <br><br> SMITH & WESSON BRANDS, INC., a Nevada Corporation, <br><br> Nominal Defendant. | Case No: <br><br> Dept No: <br><br><br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY; AND DEMAND FOR JURY** <br><br> **(Business Court requested)** <br><br> Exemption from arbitration claimed: (NAR 5(a)(1)(J), NAR(b)(1)(A), (B), and (C)) |

SWBI_000000001



*Photo of Smith & Wesson M&P AR-15 Rifle used to perpetrate Aurora, CO mass shooting.*[1]

---

[1]    *Terror on Repeat: A rare look at the devastation caused by AR-15 shootings*, WASHINGTON POST (Nov. 16, 2023), https://www.washingtonpost.com/nation/interactive/2023/ar-15-force-mass-shootings/?itid=hp-top-table-main_p001_f001.

SWBI_000000002

Plaintiffs Adrian Dominican Sisters, Sisters of Bon Secours USA, Sisters of St. Francis of Philadelphia, and Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province ("Plaintiffs"), by and through their attorneys, bring this action derivatively on behalf of Nominal Defendant Smith & Wesson Brands, Inc. ("Smith & Wesson" or the "Company"), against certain members of the Company's Board of Directors ("Board") and Smith & Wesson officers to remedy breaches of fiduciary duty. Plaintiffs make these allegations upon personal knowledge as to the facts of their ownership of Smith & Wesson stock, and upon information and belief as to all other matters, based upon the review of: (a) documents obtained pursuant to Section 16.02 of the Massachusetts General Corporation Law, Mass. Gen. Laws ch. 156D, § 16.02 ("Section 16.02 Documents" or "Section 16.02 Production"); (b) public filings made by Smith & Wesson and other related parties and nonparties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the Company and other related nonparties; (d) news articles; (e) investor communications to the Board; (f) information obtained from Smith & Wesson's website; (g) proceedings in related civil lawsuits based on the same or similar underlying misconduct; and (h) other publicly available information concerning Smith & Wesson and the Individual Defendants (defined below).

## INTRODUCTION

1. This stockholder derivative action arises because Defendants–members of Smith & Wesson's Board and senior management team–knowingly allowed the Company to become exposed to significant liability for intentionally violating federal, state, and local laws through its manufacturing, marketing, and sales of AR-15 style rifles and similar semiautomatic firearms ("AR-15 Rifles").

2. More specifically, when the Company's AR-15 Rifles are used to perpetrate mass shootings, the Board's unwillingness to exercise any oversight whatsoever in connection with the Company's illicit manufacturing, marketing, and sales of AR-15 Rifles prevent it from being

///

///

- 2 -

SWBI_000000003

afforded protection under the Protection of Lawful Commerce in Arms Act ("PLCAA"), exposing the Company to substantial liability.[2]

3.    This suit seeks to hold Smith & Wesson's Board members (among other fiduciaries) accountable for their failure to protect the Company's interests, particularly in consideration of Smith & Wesson's executives' failure to act in response to: (i) being recognized as a primary supplier of the weapon of choice for numerous mass murderers; (ii) numerous lawsuits related to the use of AR-15 Rifles to perpetrate mass shootings; (iii) state and local laws banning the sale and/or possession of AR-15 Rifles; (iv) governmental investigations regarding the Company's manufacturing, marketing, and sales of AR-15 Rifles; and (v) the substantial support of the Company's stockholders that the Board examine such practices.

4.    Much like the day of reckoning faced by purveyors of opioids who flooded the market with dangerous and deadly products, the Individual Defendants continue to place their own personal interests, greed, biases, beliefs, and political concerns above the interests of the Company and its stockholders, ignoring the high likelihood that the long-term liabilities and risks associated with the manufacturing, marketing, and sales of AR-15 Rifles will far outweigh the short-term benefits brought about through the same.

5.    Notwithstanding the stockholders' significant support of those proposals and the support of influential proxy advisors like ISS and Glass Lewis, the Individual Directors continue to willfully ignore the winds of change and the exponential increase in the number of mass murders the Company has facilitated through its actions.

6.    Simultaneously, the Individual Defendants made the affirmative decision to knowingly place the interests of the Company's customers above those of its stockholders.

7.    In light of the recent events discussed in more detail herein, Plaintiffs will establish that the Board's failure to prevent the Company's profound and significant exposure to liability

///

---

[2]    The PLCAA's immunity for firearm manufacturers and sellers is subject to "predicate exception" for "[a]ctions where a manufacturer or seller knowingly violated a State or Federal Statute applicable to the sale or marketing of the product, where violation proximately caused the harm sued upon[.]" 15 U.S.C. § 7903(5)(A)(iii).

SWBI_000000004

related to its manufacture, marketing, and sales of AR-15 Rifles amounts to a breach of fiduciary duty, mismanagement, and/or wrongdoing.

## THE PARTIES

### I.    PLAINTIFFS

8.    Plaintiff Adrian Dominican Sisters ("ADS") is a community of Catholic Sisters that is principally located in Adrian, Michigan. ADS is, and has been at all relevant times hereto, a Smith & Wesson stockholder.

9.    Plaintiff Sisters of Bon Secours USA ("SBS USA") is a community of Catholic Sisters that is principally located in Marriottsville, Maryland. SBS USA is, and has been at all relevant times hereto, a Smith & Wesson stockholder.

10.    Plaintiff Sisters of St. Francis of Philadelphia ("SSFP") is a community of Catholic Sisters that is principally located in Aston, Pennsylvania. SSFP is, and has been at all relevant times hereto, a Smith & Wesson stockholder.

11.    Plaintiff Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province ("SHN") is a community of Catholic Sisters that is principally located in Marylhurst, Oregon. SHN is, and has been at all relevant times hereto, a Smith & Wesson stockholder.

12.    Plaintiffs will continue to hold Smith & Wesson stock throughout the pendency of this action, and they will fairly and adequately represent the Company's interests.

### II.    NOMINAL DEFENDANT

13.    Nominal Defendant Smith & Wesson is a Nevada corporation with its principal executive offices located at 1852 Proffitt Springs Road, Maryville, Tennessee. The Company's shares trade on the Nasdaq Global Select Market under the ticker symbol "SWBI."

### III.    INDIVIDUAL DEFENDANTS

14.    Mark P. Smith ("Smith") has served in various positions at Smith & Wesson from 2010 to 2020. Since 2020, Smith has served as the Company's President, CEO, and as a member of the Board.

///

- 4 -

SWBI_000000005

15. Kevin A. Maxwell ("Maxwell") has served as the Company's Senior Vice President, General Counsel, Chief Compliance Officer, and Secretary since 2021.

16. Susan J. Cupero ("Cupero") served in various positions at Smith & Wesson from 2015 to 2020. Since 2021, Cupero has served as the Company's Vice President of Sales.

17. Robert L. Scott ("Scott") is the Chairman of the Company's Board and has been Chairman since August 23, 2020. Scott served in various positions at Smith & Wesson from December 1989 to February 2006, including as Vice President of Sales and Marketing, Vice President of Business Development, President, and as a consultant. Scott joined the Board in December 1999 and at all relevant times has been a member of the Board's Audit Committee, and Nominations and Corporate Governance Committee. Scott also serves as Chairman of the National Shooting Sports Foundation, Governor of the Sporting Arms and Ammunition Institute.

18. Anita D. Britt ("Britt") has served as a member of Smith & Wesson's Board since February 2018. At all relevant times, Britt has been a member of the Board's Audit Committee, Compensation Committee, and Environmental, Social and Governance Committee. Britt also serves as a member of the board of directors for other public companies, including Delta Apparel, Inc. (NYSE:DLA), urban-gro, Inc. (NASDAQ:UGRO), and VSE Corporation (NASDAQ:VSEC).

19. Fred M. Diaz ("Diaz") has served as a member of Smith & Wesson's Board since May 2021. At all relevant times, Diaz has been a member of the Board's Compensation Committee, and Environmental, Social and Governance Committee. Diaz also serves as a member of the board of directors for other public companies, including Archer Aviation Inc. (NYSE:ACHR), SiteOne Landscape Supply, Inc. (NYSE:SITE), and Valero Energy Corporation (NYSE:VLO).

20. Michelle J. Lohmeier ("Lohmeier") has served as a member of Smith & Wesson's Board since July 2023. At all relevant times, Lohmeier has been a member of the Board's Compensation Committee, and Environmental, Social and Governance Committee. Lohmeier also serves as a member of the board of directors for other public companies, including Kaman Corporation (NYSE:KAMN), and Mistras Group, Inc. (NYSE:MG). Lohmeier is a member of board

///

///

SWBI_000000006

of directors for Nammo Defense Systems Inc., a U.S. subsidiary of ammunition producer Nordic Ammunition Company.

21. Barry M. Monheit ("Monheit") has served as a member of Smith & Wesson's Board since February 2004. Monheit served as Chairman of the Company's Board from October 2004 to August 2020, and at all relevant times has been a member of the Board's Compensation Committee, and Nominations and Corporate Governance Committee. Monheit also serves as a member of the board of directors for other public companies, including Smith & Wesson's former parent company, American Outdoor Brands, Inc. (NASDAQ:AOUT). Monheit is Vice Chairman of the board of directors for That's Entertainment Corp., a company that offers entertainment based on its virtual interactive shooting experience utilizing laser technology-based replica firearms.

22. Denis G. Suggs ("Suggs") has served as a member of Smith & Wesson's Board since May 2021. At all relevant times, Suggs has been a member of the Board's Audit Committee, and Nominations and Corporate Governance Committee. Suggs also serves as a member of the board of directors for other public companies, including Patrick Industries Inc. (NASDAQ:PATK).

23. Defendants Smith, Scott, Britt, Diaz, Lohmeier, Monheit, and Suggs are, at times, collectively referred to herein as the "Director Defendants."

24. Defendants Smith, Maxwell, and Cupero are, at times, collectively referred to herein as the "Officer Defendants."

25. The Director Defendants and the Officer Defendants are referred to collectively as the "Individual Defendants."

**PROCEDURAL BACKGROUND**

26. On February 16, 2023, Plaintiffs served Smith & Wesson with a demand to inspect corporate books and records under Section 16.02 of the Massachusetts General Corporation Law, Mass. Gen. Laws ch. 156D, § 16.02 ("Section 16.02"), which entitles a "shareholder of a corporation to inspect and copy … excerpts from minutes reflecting action taken at any meeting of the board of directors … committee of the board of directors … minutes of any meeting of the shareholders, and

///

///

- 6 -

SWBI_000000007

records of action taken by the shareholders or board of directors without a meeting ….” Section 16.02(b).

27.    The purposes for Plaintiffs' Section 16.02 demand were to, among other things, investigate and evaluate whether members of Smith & Wesson's Board breached their fiduciary duties by failing to prevent and/or exercise sufficient oversight in connection with the Company's exposure to a substantial likelihood of liability in connection with its manufacturing, marketing, and sale of AR-15 Rifles.

28.    Between February and April 2023, the parties negotiated a non-disclosure agreement and the Company agreed to produce some responsive Board-level documents.

29.    On May 5, 2023, Smith & Wesson produced 791 pages of documents, including: (i) 23 publicly available SEC filings, corporate governance documents, and slip sheets, representing 716 pages of the production; (ii) minutes from the Company's Annual Meetings dated between 2020 and 2022, representing 27 pages of the production; (iii) minutes from two Board meetings dated between 2020 and 2022, representing five pages of the production; (iv) minutes from one meeting of the Board's Environmental, Social and Governance Committee ("ESG Committee") dated March 2023, representing two pages of the production; (v) two Digimind media monitoring reports dated 2018 and 2022 (all but two pages redacted), representing 31 pages of the production; and (vi) one presentation to the Board regarding a 2020 stockholder proposal, representing 10 pages of the production.

30.    After engaging in several rounds of correspondence and meet and confers, on May 30, 2023, the Company initially agreed to supplement its production. However, on June 9, 2023, Smith & Wesson reneged and "decline[d] to supplement its prior production of documents," asserting in its correspondence that "[t]he provided documents would sufficiently demonstrate to any party acting in good faith not only that the SWBI Board of Directors has gone above and beyond in investigating and monitoring the very risks raised by [Plaintiffs] …."

///

///

SWBI_000000008

31. Based on the Company's representation about the documents produced in response to Plaintiffs Section 16.02 demand, it is reasonable to infer that exculpatory information not reflected in the production of Board-level books and records does not exist.[3]

**SUBSTANTIVE ALLEGATIONS**

I. **THE HISTORY OF SMITH & WESSON AND THE AR-15 RIFLE**

32. For the first 153 years of Smith & Wesson's existence, the Company held itself out as a successful beacon of responsible gun ownership and did not manufacture, market, or sell military-grade, mass-killing assault weapons.[4]

33. However, the Company's prudence was abandoned in January 2006, when Smith & Wesson began manufacturing, marketing, and selling AR-15 Rifles. In 1977, the patent on the AR-15 Rifle lapsed, and many gun manufacturers began producing civilian variants.

34. Less than 20 years ago, most people in the firearms industry regarded AR-15 Rifles as "distasteful and dangerous, they chose not to promote [them] at events."[5]

35. In fact, before September 13, 2004, when the Federal Assault Weapons Ban expired, the manufacture, transfer, and possession of AR-15 Rifles was prohibited.[6]

36. When the ban on military-style semiautomatic assault rifles expired in 2004, gun manufacturers immediately began selling AR-15 Rifles to the civilian gun market. However, Smith & Wesson saw the risk of liability that it would face by manufacturing, marketing, and selling such devices and chose not to enter the new market without legal protections.

37. In an effort to insulate itself from the inherent risk of liability that would accompany the inclusion of AR-15 Rifles into its product line, Smith & Wesson partnered with the National Rifle Association ("NRA"), spending millions of dollars to lobby Congress for a new federal law

///

---

[3] *See Teamsters Local 443 Health Serv's & Ins. Plan v. Chou*, C.A. No. 2019-0816-SG, 2020 WL 5028065, at *24 n.314 (Del. Ch. Aug. 24, 2020).
[4] Smith & Wesson, *Our Story*, available at https://www.smith-wesson.com/ourstory.
[5] Ryan Busse, *The Rifle That Ruined America*, THE ATLANTIC (June 15, 2022), https://www.theatlantic.com/ideas/archive/2022/06/ar-15-rifle-mass-shootings-gun-control/661275/.
[6] 18 U.S.C. §§ 922 *et seq*.

SWBI_000000009

that they hoped would shield gun makers from lawsuits filed against them when their guns, including AR-15 Rifles, were used to kill or injure people.

38.    Smith & Wesson's successful lobbying efforts resulted in the passage of the PLCAA, which was signed into law on October 25, 2005. On the Company's subsequent earnings call, then Smith & Wesson President and CEO Michael Golden told investors he "had the honor of attending the signing of the [PLCAA]" and that it marked "a great day for our industry and for me personally."

39.    Within a few months of the PLCAA being signed into law, Smith & Wesson entered the civilian assault weapons market and began selling AR-15 Rifles (*i.e.*, the M&P 15).

40.    Since then, Smith & Wesson has enjoyed with abandon the record-breaking profits from its sale of AR-15 Rifles, seemingly unfazed by the exponential rise in gun deaths and mass shootings carried out with its product in the United States.

41.    By the end of 2012, eight (8) years after the Federal Assault Weapons Ban expired, the number of mass shootings per year had more than doubled.[7] In 2016, the NRA dubbed the AR-15 Rifle, "America's Rifle."

42.    By 2020, Smith & Wesson became the second largest producer of AR-15 Rifles in the United States. Between 2012 and 2021, Smith & Wesson generated more than $695 million in revenue from its AR-15 Rifle sales.

43.    Disturbingly, Smith & Wesson appears to welcome that its revenues increase following mass shootings. In its 2019 10-K filing, Smith & Wesson acknowledged that speculation about the passage of gun violence prevention legislation—speculation which often increases in the wake of a mass shooting—can "often … result in increased near-term consumer demand" for Smith & Wesson products.

44.    At bottom, Smith & Wesson covets short-term profit over long-term risk. Having abandoned its long history of risk-averse stewardship, the Company is now intent on  marketing and selling its AR-15 Rifles in whichever manner results in the most sales–even if its marketing is illegal,

---

[7]  Brad Plumer, *Everything you need to know about the assault weapons ban, in one post*, WASHINGTON    POST    (Dec.    17,    2012), https://www.washingtonpost.com/news/wonk/wp/2012/12/17/everything-you-need-to-know-about-banning-assault-weapons-in-one-post/.

SWBI_000000010

attracts a dangerous category of consumers, facilitates an unrelenting and growing stream of mass killings, and causes the Company to face an ever-increasing and substantial likelihood of liability that threatens its long-term existence.

**II.    SMITH & WESSON BEGINS TO MANUFACTURE AR-15 RIFLES AND IGNORES THE GLARING RED FLAGS OF MASS SHOOTINGS AND LEGAL CHALLENGES**

45.    Developed by ArmaLite in the 1950s, the original AR-15 Rifle evolved into the military use M-16 with automatic fire capability.[8]

46.    Such rifles fire bullets at three times the velocity of ordinary handguns, and bullets fired from an AR-15 Rifle hit their targets with such force that they rip open cavities inside the human body and then become unstable as they travel around destroying far more organs and tissue than ordinary handgun rounds.[9]

47.    Smith & Wesson began manufacturing, marketing, and selling AR-15 Rifles in January of 2006.[10]

48.    AR- 15-style rifles have been the weapon of choice for the killers responsible for the deadliest mass shootings in American history, including the recent mass murders in: (i) Buffalo, New York; (ii) Uvalde, Texas; (iii) Highland Park, Illinois; (iv) Colorado Springs, Colorado; (v) Nashville, Tennessee; (vi) Louisville, Kentucky; (vii) Allen, Texas; and (viii) Lewiston, Maine.[11]

49.    Since 2012, Smith & Wesson AR-15 Rifles have been used by numerous perpetrators of highly publicized mass shootings, including:

///

---

[8]    *A Brief History of the AR-15*, NATIONAL PUBLIC RADIO (Feb.28, 2018), available at www.npr.org/2018/02/28/588861820/a-brief-history-of-the-ar-15.

[9]    Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), available at https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/.

[10]    Press Release, *Smith & Wesson Enters Long-Gun Market with M&P15 Rifles* (Jan. 18, 2006), https://ir.smith-wesson.com/news-releases/news-release-details/smith-wesson-enters-long-gun-market-mp15-rifles?ID=805601&c=90977&p=irol-newsArticle.

[11]    Follman, *et al.*, *US Mass Shootings, 1982–2023: Data From Mother Jones' Investigation*, MOTHER JONES (May 7, 2023), available at https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/.

SWBI_000000011

(i)      the 40-year-old man who took eighteen (18) lives and left thirteen (13) injured in a bowling alley and bar in Lewiston, Maine in October 2023;[12]

(ii)     the 21-year-old man who took seven (7) lives and left forty-six (46) injured in an attack at a Fourth of July parade in Highland Park, Illinois in July 2022;[13]

(iii)    the 22-year-old man who took one (1) life and left three (3) injured at the Chabad of Poway synagogue in Poway, California in April 2019;[14]

(iv)     the 19-year-old man who took seventeen (17) lives and left seventeen (17) injured at Marjory Stoneman Douglas High School in Parkland, Florida in February 2018;[15]

(v)      the 28-year-old man who took fourteen (14) lives and left twenty-one (21) injured at a community center in San Bernadino, California in December 2015;[16] and

(vi)     the 24-year-old man who took twelve (12) lives and left seventy (70) injured at a movie theater in Aurora, Colorado in July 2012.[17]

50.    In fact, the perpetrator in all five of the above referenced mass shootings used the same Smith & Wesson AR-15 Rifle–the M&P15. The reason for this commonality is by design:

///

///

---

[12]   Russell, *et al.*, *Here's what we know about the shootings*, NY TIMES (Oct. 26, 2023), https://www.nytimes.com/live/2023/10/25/us/lewiston-maine-shooting/lewiston-maine-shooting?smid=url-share; Patty Wight, *State police ID three guns found in Lewiston mass shooting suspect's car and near his body*, MAINE PUBLIC (Oct. 30, 2023), available at https://www.mainepublic.org/maine/2023-10-30/state-police-id-three-guns-found-in-lewiston-mass-shooting-suspects-car-and-near-his-body.

[13]   Frank Main, *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, CHICAGO SUN TIMES (July 6, 2022), https://chicago.suntimes.com/2022/7/6/23197100/highland-park-mass-shooting-gun-mith-wesson-mp15-semiautomatic-rifle-fourth-july-parade-robert-crimo.

[14]   Max Hauptman, *Synagogue shooting victims can sue gunmaker Smith & Wesson, California judge rules*, WASHINGTON POST (July 11, 2021), available at https://www.washingtonpost.com/nation/2021/07/11/poway-synagogue-shooting-lawsuit/.

[15]   Audra D. S. Burch, *Death Toll Is at 17 and Could Rise in Florida School Shooting*, NY TIMES (Feb. 14, 2018), https://www.nytimes.com/2018/02/14/us/parkland-school-shooting.html.

[16]   Sari Horwitz, *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, WASHINGTON POST (Dec. 3, 2015), https://www.washingtonpost.com/world/national-security/suspects-in-san-bernadino-shooting-had-a-small-arsenal/2015/12/03/9b5d7b52-99db-11e5-94f0-9eeaff906ef3_story.html.

[17]   James Dao, *Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol*, NY TIMES (July 23, 2012), https://www.nytimes.com/2012/07/24/us/aurora-gunmans-lethal-arsenal.html.

---

- 11 -

SWBI_000000012

AR-15 Rifles were created to inflict maximum casualties in the shortest amount of time and can be easily modified for automatic fire.[18]

51.    Not surprisingly, as a consequence of intense marketing efforts by Smith & Wesson and other manufacturers, coupled with ease of access, AR-15 Rifles accounted for an alarming 85% of mass shooting deaths from 1981 to 2017.[19]

52.    For example, since 2017, AR-15 Rifles that were manufactured and marketed by companies other than Smith & Wesson have also been used by numerous perpetrators of highly publicized mass shootings, including:

(i)    the 33-year-old man who took eight (8) lives and left seven (7) injured outside a shopping mall in Allen, Texas in May 2023;[20]

(ii)    the 25-year-old man who took five (5) lives and left eight (8) injured inside Old National Bank in Louisville, Kentucky in April 2023;[21]

(iii)    the 28-year-old who took six (6) lives and left six (6) injured at the Covenant School in Nashville, Tennessee in March 2023;[22]

(iv)    the 22-year-old man who took five (5) lives and left two (2) injured in a nightclub in Colorado Springs, Colorado in November 2022;[23]

///

---

[18]    Committee on Oversight and Reform, *Hearing on The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022), https://oversight.house.gov/legislation/hearings/the-urgent-need-to-address-the-gun-violence-epidemic; Everytown, *Assault Weapons and High-Capacity Magazines* (April 2020), https://everytownresearch.org/wp-content/uploads/sites/4/2020/07/EFGV02_Assault-Weapons-and-High-Capacity-Magazines_Rd2_6-1.pdf.

[19]    DiMaggio, *et al.*, *Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data*, J. TRAUMA ACUTE CARE (Jan. 2019).

[20]    Feuer, *et al.*, *After Texas Mall Shooting, Searching for Motive and Grieving for Children*, NY TIMES (May 8, 2023), https://www.nytimes.com/2023/05/08/us/texas-mall-shooting-mauricio-garcia.html.

[21]    Dylan Lovan, *Louisville bank employee livestreamed attack that killed 5*, ASSOCIATED PRESS (April 10, 2023), https://apnews.com/article/downtown-louisville-shooting-dc7b45a9c5d2b384a16d653864f8b735.

[22]    Rachel Wegner, *'Truly horrific': Nashville mourns after mass shooting at elementary school*, THE TENNESSEAN (Mar. 27, 2023), https://www.tennessean.com/story/news/crime/2023/03/27/nashville-mourns-mass-shooting-covenant-school/70052585007/.

[23]    Lance Benzel, *5 killed, 17 wounded in shooting at LGBTQ nightclub in Colorado Springs*, THE COLORADO SUN (Nov. 20, 2022), https://coloradosun.com/2022/11/20/club-q-shootins-colorado-springs/.

SWBI_000000013



(v)     the 20-year-old man who took three (3) lives and left two (25) injured at a shopping mall in Greenwood, Indiana in July 2022;[24]

(vi)    the 45-year-old man who took four (4) lives and left several injured at a medical center in Tulsa, Oklahoma in June 2022;[25]

(vii)   the 18-year-old man who took twenty-one (21) lives and left seventeen (17) injured at Robb Elementary School in Uvalde, Texas in May 2022;[26]

(viii)  the 18-year-old man who took ten (10) lives and left three (17) injured at a grocery store in Buffalo, New York in May 2022;[27]

(ix)    the 19-year-old man who took eight (8) lives and left seven (7) injured at a FedEx warehouse in Indianapolis, Indiana in April 2021;[28]

(x)     the 21-year-old man who took ten (10) lives and left one (1) injured at a grocery store in Boulder, Colorado in March 2021;[29]

(xi)    the 36-year-old man who took seven (7) lives and left twenty-five (25) injured in Odessa and Midland, Texas in August 2019;[30]

(xii)   the 24-year-old man who took nine (9) lives and left twenty-seven (27) injured in the entertainment district of Dayton, Ohio in August 2019;[31]

(xiii)  the 21-year-old man who took twenty-two (22) lives and left twenty-six (26) injured at a Walmart and shopping center in El Paso, Texas in August 2019;[32]

---

[24]   *Chief: 3 dead in Indiana mall shooting; witness kills gunman*, ASSOCIATED PRESS (July 17, 2022), https://apnews.com/article/indiana-mall-shooting-345348912b288dce656083b2422c2fde.

[25]   Amanda Watts, *Gunman who killed 4 at Oklahoma medical building had been a patient of a victim, police chief says*, CNN (June 2, 2022), https://www.cnn.com/2022/06/02/us/tulsa-hospital-shooting-thursday/index.html.

[26]   Emily Foxhall, *Uvalde school shooting updates: Gunman shared violent plan shortly before reaching school*, HOUSTON CHRONICLE (May 24, 2022), https://www.houstonchronicle.com/news/houston-texas/texas/article/Uvalde-school-shooting-Texas-17196069.php.

[27]   Ashley Southall, *Before the Massacre, Erratic Behavior and a Chilling Threat*, NY TIMES (May 15, 2022), https://www.nytimes.com/2022/05/15/nyregion/gunman-buffalo-shooting-suspect.html.

[28]   Tony Cook, *FedEx shooting: Gunman parked car and began 'randomly' firing, police say*, INDIANAPOLIS STAR (Apr. 16, 2021), https://www.indystar.com/story/news/crime/2021/04/16/indianapolis-fedex-shooting-gunman-parked-car-and-began-randomly-firing-police-say/7251130002/.

[29]   *Suspect Charged With 10 Counts of Murder in Boulder, Colo., Shooting*, NY TIMES (Mar. 23, 2021), https://www.nytimes.com/live/2021/03/23/us/boulder-colorado-shooting.

[30]   Wesley Lowery, *5 killed, 21 injured in a mass shooting in Odessa, Tex.*, WASHINGTON POST (Aug. 31, 2019), https://www.washingtonpost.com/politics/5-killed-21-injured-after-suspect-hijacked-a-mail-truck-in-odessa-texas/2019/08/31/f659da2c-cc3c-11e9-be05-f76ac4ec618c_story.html.

[31]   Timothy Williams, *Gunman Kills 9 in Dayton Entertainment District*, NY TIMES (Aug. 4, 2019), https://www.nytimes.com/2019/08/04/us/dayton-ohio-shooting.html.

[32]   Robert Moore, *Officials call El Paso shooting a domestic terrorism case, weigh hate crime charges*, WASHINGTON POST (Aug. 4, 2019), https://www.washingtonpost.com/nation/2019/08/04/investigators-search-answers-after-gunman-kills-el-paso/.

SWBI_000000014

(xiv)  the 19-year-old man who took three (3) lives and left twelve (12) injured at a festival in Gilroy, California in July 2019;[33]

(xv)  the 46-year-old man who took eleven (11) lives and left six (6) injured at a synagogue in Pittsburgh, Pennsylvania in October 2018;[34]

(xvi)  the 29-year-old man who took four (4) lives and left four (4) injured at a Waffle House in Antioch, Tennessee in April 2018;[35]

(xvii)  the 44-year-old man who took five (5) lives and left ten (10) injured in Rancho Tehama, California in November 2017;[36]

(xviii)  the 26-year-old man who took twenty-six (26) lives and left twenty-two (22) injured at the First Baptist Church in Southerland Springs, Texas in November 2017.[37]

53.  Notably, the perpetrators involved in five of the six, highly-publicized mass shootings involving Smith & Wesson's AR-15 Rifles that are set forth above, were males between the ages of 19 and 28.

54.  This staggering statistic, which was known or should have been known to the Company's executives and Board members, is no coincidence. Indeed, it was Smith & Wesson's targeted marketing practices that ensured that its AR-15 Rifles would be purchased and used by emotionally troubled young men through advertisements designed to take advantage of young men's impulsive behavior and lack of self-control, by: (i) falsely glorifying the implied endorsement by the military and law enforcement; and (ii) cunningly presenting the use of AR-15 Rifles as a real-life version of the adrenaline-filled experiences they have had in first-person shooter games.

---

[33]  David Curran, *19-year-old suspect IDd in Gilroy Garlic Festival shooting*, SFGATE (July 29, 2019), https://www.sfgate.com/news/article/Report-Suspect-ID-in-Gilroy-Garlic-Festival-14192736.php.

[34]  Campbell Robertson, *11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts*, NY TIMES (Oct. 27, 2018), https://www.nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html.

[35]  Katie Zezima, *Waffle House shooting suspect Travis Reinking arrested, refusing to answer questions, police say*, WASHINGTON POST (Apr. 23, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/04/23/waffle-house-shooting-travis-reinking-manhunt-continues-nashville-police-say/.

[36]  Richard Gonzales, *Police Find Body Of Tehama County Gunman's Wife, Making His Death Toll 5*, NPR (Nov. 15, 2017), https://www.npr.org/sections/thetwo-way/2017/11/15/564335359/in-harm-s-way-school-staff-saved-students-during-tehama-county-shooting.

[37]  David Montgomery, *et al.*, *Gunman Kills at Least 26 in Attack on Rural Texas Church*, NY TIMES (Nov. 5, 2017), available at https://www.nytimes.com/2017/11/05/us/church-shooting-texas.html.

SWBI_000000015

55.     Thus, the Board has been aware, since at least 2000, that Smith & Wesson's marketing practices played a significant role in contributing to many of the most heinous gun crimes in United States history.

56.     Indeed, when the Company negotiated a settlement agreement with the federal government in 2000 (the "2000 Settlement Agreement") it agreed to, *inter alia*, "[n]ot market any firearm in a way that would make the firearm particularly appealing to juveniles or criminals" due to the foreseeable risk of such advertising fueling unlawful acts of violence by such actors.

57.     Nevertheless, the Company's executives and Board members have since chosen to flagrantly ignore the safe marketing practices it committed to in the 2000 Settlement Agreement, and instead focus on the continued targeting of young consumers, eschewing any effort to mitigate the potential harm to the Company caused by such practices.[38]

## A.     SMITH & WESSON'S USE OF THE FIRST-PERSON SHOOTER AESTHETIC MARKETING

58.     When Smith & Wesson first began selling AR-15 Rifles in 2006, then-President and Chief Executive Officer Michael Golden acknowledged that the company was marketing weapons as "tactical," stating: "We also believe that our M&P rifle series fills a tremendous gap in the marketplace by delivering high-quality, feature-rich tactical rifles that will be readily available in commercial channels." The Company designed advertisements for its products to mimic the aesthetic of being the shooter in a video game ("first-person shooter aesthetic").

59.     First-person shooter aesthetic video games are disproportionately popular among young men, including many of those involved in the mass killings described above. In fact, the first-

---

[38] *See Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL, Dkt. No. 289 at 8 (Cal. Supr. Ct. San Diego, July 2, 2021) (stating in order denying motion to dismiss that "Smith & Wesson entered into a settlement with the federal government and several cities, and vowed to reform its business practices to prevent criminal misuse of its guns, including agreeing to not sell a weapon designed in a manner so that with a few additional parts and/or minimal modifications an owner can convert the firearms into an illegal fully automatic weapon. Twenty years later, Smith & Wesson has continued selling firearms that it knew could be easily modified to turn into fully automatic assault weapons - even when its modified guns have been used in other mass shootings. It also fraudulently and deceptively marketed its Rifle with known intent to put them in the hands of persons in a demographic particularly likely to cause extreme harm--and indeed, harm that is the epitome of cruel and unjust hardship in conscious disregard of the rights and safety of others.").

SWBI_000000016

person shooter aesthetic is used in many popular games, like Call of Duty, which is popular among teens and young adults, including the Highland Park Shooter. Call of Duty is played by more than 400 million people and is played by at least 6.5 million people on a daily basis. In Call of Duty, players step into the shoes of members of the military or law enforcement and seek to complete virtual combat missions:



60.     The Company's advertising mimics this first-person shooter aesthetic, including in, but not limited to, the following examples:

(i)     Smith & Wesson published the following advertisement for its AR-15 Rifles on its corporate channel on the popular social media site YouTube:



(ii)    Smith & Wesson published the following advertisement for its AR-15 Rifle:

///

///

///

///

SWBI_000000017



(iii)   Smith & Wesson published an advertisement that encouraged people to "Experience real-life first-person shooting with the Smith & Wesson M&P rifle" and displayed the following scene showing a shooter loading an AR-15 Rifle from the first-person shooter perspective, with what appears to be a high-capacity magazine, as the narrator invited viewers to "Experience more adrenaline":[39]



61.    Smith & Wesson ads mimicking first-person shooter games are aimed at appealing to young, and predominantly male consumers of such games, who could (and have) become motivated and desensitized by the same, and then drawn to reenacting their deadly video game experience in real life.

62.    The advertisements gamifying the use of firearms in real life, glorify the lone gunman and the militaristic design of the Company's AR-15 Rifles, and indicate that its AR-15 Rifles are

---

[39]    Smith & Wesson, *Get the Experience*, ISPOT.TV (Feb. 26, 2015), available at https://www.ispot.tv/ad/7a72/smith-and-wesson-m-and-p-rifle-get-the-experience.

- 17 -

SWBI_000000018

well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

63.    Smith & Wesson aggressively published its advertisements and established a marketing presence on social media platforms disproportionately visited by younger consumers, including, but not limited to, YouTube, Instagram, and Facebook (@smithwessoninc, @smithandwessongear, and facebook.com/SmithandWessonInc).

64.    Smith & Wesson also advertises its AR-15 Rifles using images of children handling its firearms, distributing those images over social media, which means the Company is specifically targeting youth despite the fact that many states impose age restrictions preventing youth from purchasing and/or lawfully possessing its AR-15 Rifles.[40]

65.    Smith & Wesson also markets its AR-15 Rifles nationwide, distributing images and videos over social media to an audience that includes individuals in every state–this practice continues despite the fact that many states have enacted laws that generally ban the sale, manufacture, and transfer of AR-15 Rifles.[41]

66.    Thus, by marketing its AR-15 Rifles to individuals who are prohibited from possessing AR-15 Rifles, and to people who live in locales where they are banned, the Individual Defendants knowingly and intentionally allow the Company to be exposed to a substantial likelihood of liability.

B.    **SMITH & WESSON'S MISLEADING ASSOCIATION WITH MILITARY AND LAW ENFORCEMENT**

67.    Smith & Wesson's marketing campaign also caters to the characteristics and preferences of a dangerous and easily influenced segment of society and promotes the AR-15 Rifle's suitability for offensive military-style combat missions by repeatedly and falsely associating Smith

///

---

[40]    Sixteen states and the District of Columbia have enacted laws that impose a minimum age (18 or 21) at which persons can possess AR-15 Rifles.
[41]    Eight states (California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, and New York), as well as the District of Columbia, have enacted laws that generally ban the sale, manufacture, and transfer of AR-15 Rifles.

    SWBI_000000019

& Wesson civilian products with the United States military and law enforcement, including, but not limited to, by:

> (i)     falsely representing or suggesting that Smith & Wesson products are utilized or endorsed by military and law enforcement;
>
> (ii)    using "M&P" in the "M&P 15" designation of its AR-15 Rifles to stand for "Military & Police"; and
>
> (iii)   showing Smith & Wesson products similar to its AR-15 Rifles being used by, or positioned near, individuals wearing what appear to be military and/or law enforcement uniforms or gear, with text resembling oaths taken by military and/or law enforcement personnel, and implying that Smith & Wesson products are "[s]elected" or "[c]hosen" by these groups, reinforcing this association with pictures of American flags.






SWBI_000000020

68.    In publicly available documents, Smith & Wesson has referred to the strategy of associating its products with the military and law enforcement for the purpose of attracting civilian consumers as the "halo effect." Smith & Wesson has explained to investors that the "halo [effect]" benefits its AR-15 Rifle brand by conferring "credibility" on its products in the eyes of civilian consumers.

69.    However, this supposed association of Smith & Wesson's AR-15 Rifles with the United States military and law enforcement, which promotes the notion that Smith & Wesson weapons are well-suited for offensive military-style combat missions, is a fiction aimed at deceiving the public and attracting a dangerous class of would-be mass shooters.

70.    The intent of Smith & Wesson's branding and marketing campaign is clear: to increase civilian sales by conveying the deceptive implied claim that its AR-15 Rifles are approved and used by the U.S. military and law enforcement.

71.    The Company's emphasis on militaristic and law enforcement imagery in its AR-15 Rifle marketing aligns with advice from the National Shooting Sports Foundation to the industry in 2017 that the segment of the consumer market "most likely to purchase [an AR-15-style rifle] . . . places value on firearms that have been recommended or used by professionals."

72.    The implication that Smith & Wesson's AR-15 Rifles are endorsed or regularly used by the United States military and law enforcement increases their "credibility" and consequently

SWBI_000000021

makes it more likely that consumers will purchase them. The company's public statements regarding its "halo effect" strategy reveal Smith & Wesson's belief that those associations are material to consumers.

73. The narratives intentionally conveyed by Smith & Wesson's advertising combine to promote its products in a way which increases the likelihood of their foreseeable misuse by individuals that will use its products for illegal purposes, including to carry out offensive, military-style combat missions against their perceived enemies.

74. In fact, the selection and use of Smith & Wesson's AR-15 Rifles makes it more difficult and more dangerous for law enforcement to respond to mass shootings. A recently released interim report focused on the mass shooting at an elementary school in Uvalde, Texas revealed that the perpetrator's use of an AR-15 Rifle caused 376 responding law enforcement to fear for their own safety and wait 73 minutes before taking action to eliminate the perpetrator.[42]

75. Had the responding law enforcement officers faced a perpetrator wielding a handgun or other traditional firearm, they would not have required specialized protective equipment to ensure their own safety, and it is likely that they would have acted more quickly and saved more lives.[43]

76. Based on the use of false information to promote the use of its AR-15 Rifles for foreseeable mass shootings, the Company's marketing practices violate state consumer protection and tort laws (*e.g.*, Illinois Consumer Fraud and Deceptive Business Practices Act, Illinois Uniform Deceptive Trade Practices Act, etc.), and Smith & Wesson lacks the protection otherwise afforded to gun manufacturers under the PLCAA.

**C.    SMITH & WESSON IGNORES LAWS LIMITING AND BANNING AR-15 RIFLES**

*a.    The Company's AR-15 Rifles Violate State and Local Law*

---

[42]  Texas House of Representatives, *Investigative Committee on the Robb Elementary Shooting, Interim Report 2022*, at pp. 48-66 (July 17, 2022), https://static.texastribune.org/media/files/d005cf551ad52eea13d8753ede93320c/Uvalde%20Robb%20Shooting%20Report%20-%20Texas%20House%20Committee.pdf?_ga=2.157349050.1435251990.1659967878-2065135766.1659967878.
[43]  *Id*.

77.     Ten states (*i.e.*, California, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington), as well as the District of Columbia, have enacted laws that generally ban the sale, manufacture, and transfer of AR-15 Rifles.

78.     Three of the recent mass shootings that were perpetrated with the Company's AR-15 Rifles were in states banning the sale, manufacture, and transfer of AR-15 Rifles (*i.e.*, California and Illinois).

79.     Notwithstanding the state and local laws banning the sale, manufacture, and transfer of AR-15 Rifles, the Individual Defendants knowingly and intentionally fail to take any steps to prevent or curb Smith & Wesson's continued marketing and sale of the Company's AR-15 Rifles in those jurisdictions.

80.     Based on the use of the Company's AR-15 Rifles to perpetrate mass shootings in states banning the sale, manufacture, and transfer of AR-15 Rifles, the Individual Defendants knew that the Company's AR-15 Rifles have at all times been sold, manufactured, and/or transferred to individuals in violation of state and local law.

### b.    The Company's AR-15 Rifles Violate Federal Law

81.     The Company's AR-15 Rifles violate the federal prohibition on the sale of "machinegun[s]" to the general public, whether directly or as accomplices. Under the National Firearms Act ("NFA"), a "machinegun" is defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

82.     Section 922(b)(4) of 18 U.S.C. prohibits the sale of "machinegun[s]" to members of the general public who have not undergone a required registration process, and the definition includes not only weapons that are designed to function as fully automatic firearms when they leave

SWBI_000000023

the factory, but also weapons that are designed to be easily modified to fire in a fully automatic capacity and/or approximate the rate of fire of a fully automatic weapon.

83.     In 1982, the Bureau of Alcohol, Tobacco Firearms and Explosives underscored that the NFA definition of "machinegun[s]" includes "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts." Smith & Wesson's AR-15 Rifles fall within the definition of "machinegun[s]" because they can be easily modified to facilitate automatic fire.

84.     Congress restricted the sale and possession of "machinegun[s]" because automatic fire weapons pose an undue risk to members of the public, provide no or negligible benefit to law-abiding civilian users, and they are disproportionately likely to be misused by bad actors in mass shootings.

85.     Rather than significantly altering the design of its AR-15 Rifles to reduce their utility in combat-like situations, Smith & Wesson intentionally makes its AR-15 Rifles so that they can be easily and readily modified to function as fully automatic weapons or approximate a fully automatic rate of fire in a variety of easy and low-cost ways, including: (i) replacing the manufacturer-installed sear system inside the AR-15 Rifles (which enable semi-automatic fire) with a third-party sear system which enables automatic fire; (ii) shaving down part of the manufacturer-installed sear system to change the way it functions; and (iii) attaching an external device such as a "bump stock" or trigger crank to the weapon.

86.     In fact, even after it was widely publicized that one of the two shooters in the 2015 San Bernardino, California mass shooting wielded a Smith & Wesson AR-15 Rifle that had been modified via the "shaving down" method, the Company did nothing to address the issue. Yet, in the 2000 Settlement Agreement, Smith & Wesson committed that it would not "sell … a weapon designed in a manner so that with few additional parts and/or minimal modifications an owner can convert the firearm to an illegal fully automatic weapon."

///

- 23 -

SWBI_000000024

87. Since that time, the Individual Defendants have intentionally undertaken no and/or insufficient efforts to alter or redesign its "civilian" version of the military M4 carbine to prevent or deter such modifications, continuing instead to design its AR-15 Rifles with features that allow them to be easily modified to fire automatically.

88. Indeed, Smith & Wesson essentially copied the design of a fully automatic weapon that is made for combat, not for any legitimate need of a law-abiding civilian, while manufacturing, transferring, and selling them in violation of the NFA and the Gun Control Act ("GCA").

89. As the Company does not identify its AR-15 Rifles as NFA weapons, retailers and consumers are led to believe that they can sell and obtain these weapons without complying with the NFA's requirements.

90. By choosing not to identify its AR-15 Rifles as NFA weapons, retailers and consumers of the AR-15 Rifles rely upon this omission to obtain them without complying with the NFA's requirements, resulting in the Company's knowing violation of various state consumer protection laws (*e.g.*, Illinois Consumer Fraud and Deceptive Business Practices Act, Illinois Uniform Deceptive Trade Practices Act, etc.).

91. Therefore, the Individual Defendants knowingly and intentionally allow the Company to manufacture, market, and sell AR-15 Rifles that violate federal law and unnecessarily exposes Smith & Wesson to a substantial likelihood of liability.

**III.    CURRENT INVESTIGATIONS, LAWSUITS, AND EXPOSURE TO LIABILITY**

92. Recently, on December 20, 2022, the City of Buffalo, New York, filed a lawsuit against the Company and others in connection with the "design, manufacturing, importing, selling, marketing and distribution of … firearms" that "have created, maintained, or contributed to a condition in the City of Buffalo that endangers the safety and health of the public."[44]

///

---

[44]   Mike Curley, *Buffalo Sues Firearms Makers Over Gun Violence And Deaths*, Law360 (Dec. 20, 2022), available at https://www.law360.com/articles/1560231/buffalo-sues-firearms-makers-over-gun-violence-and-deaths; Complaint, *The City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 815602/2022 (N.Y. Sup. Dec. 20, 2022).

SWBI_000000025

93. Before that, on September 27, 2022, and September 28, 2022, survivors and families of victims of the Fourth of July shooting in Highland Park, Illinois, filed lawsuits against the Company in connection with its marketing of AR-15 Rifles.[45]

94. Throughout those lawsuits, the Company's bases for liability turn on its needless, unfair, deceptive, and unlawful marketing of AR-15 Rifles in a way that attracts, encourages, and facilitates mass shooters.[46]

95. And, on May 26, 2022, in the wake of the mass shootings in Buffalo and Uvalde, the U.S. House of Representatives Committee on Oversight and Reform ("Committee") opened an inquiry into five leading manufacturers of AR-15 Rifles, including Smith & Wesson.[47] The Committee sought documents and information related to your company's manufacture, marketing, and sale of AR-15-style firearms.[48]

96. As explained in the May 26 letter, the Committee investigated the Company's practices related to AR-15 Rifles to inform legislative efforts to achieve common-sense gun safety measures to save American lives. In connection therewith, on July 27, 2022, the Committee released

---

[45]  Emily Field, *Ill. Families Sue Smith & Wesson Over July 4 Shooting*, LAW360 (Sept. 28, 2022), available at https://www.law360.com/articles/1534965/ill-families-sue-smith-wesson-over-july-4-shooting; Complaint, *Roberts v. Smith & Wesson Brands, Inc.*, No. 22LA00000487 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Rodriguez v. Smith & Wesson Brands, Inc.*, No. 22LA00000492 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Sedano v. Smith & Wesson Brands, Inc.*, No. 22LA0490 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Straus v. Smith & Wesson Brands, Inc.*, No. 22LA0489 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Sundheim v. Smith & Wesson Brands, Inc.*, No. 22LA0488 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Tenorio v. Smith & Wesson Brands, Inc.*, No. 22LA0493 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Toledo v. Smith & Wesson Brands, Inc.*, No. 22LA0495 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Vergara v. Smith & Wesson Brands, Inc.*, No. 22LA0494 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Zeifert v. Smith & Wesson Brands, Inc.*, No. 22LA0496 (Ill. Cir. Ct. Sept. 27, 2022); Complaint, *Turnipseed v. Smith & Wesson Brands, Inc.*, No. 22LA0497 (Ill. Cir. Ct. Sept. 28, 2022) (collectively, and with any omitted related cases, the "Highland Park Cases").
[46]  Complaint ¶ 5, *Turnipseed v. Smith & Wesson Brands, Inc.*, No. 22LA0497 (Ill. Cir. Ct. Sept. 28, 2022).
[47]  Jacob Knutson, *House Oversight panel investigates gun makers after Uvalde mass shooting*, AXIOS (May 27, 2022), https://www.axios.com/2022/05/27/house-oversight-gun-manufacturers-investigation-uvalde; Letter from Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform, to Mark P. Smith, President and Chief Executive Officer, *Smith & Wesson Brands, Inc.* (May 26, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022-05-26.CBM%20to%20Smith-Smith%20and%20Wesson%20Brands%20re%20Gun%20Violence.pdf.
[48]  Committee on Oversight and Reform, *Press Release: Chairwoman Maloney Launches Investigation into Manufacturers of Assault Weapons Used in Mass Shootings* (May 27, 2022), https://oversight.house.gov/news/press-releases/chairwoman-maloney-launches-investigation-into-manufacturers-of-assault-weapons.

- 25 -

SWBI_000000026

a memorandum ("Committee Report") addressing the Company's manufacture, marketing, and sales of AR-15 Rifles, and which extensively details false and/or problematic marketing practices for which the Company is unprotected from liability under the Protection of Lawful Commerce in Arms Act ("PLCAA").[49]

97. Moreover, because the Company refused to comply with the Committee's requests, it now faces a subpoena and potential legal action in connection with the Committee's investigation.[50]

98. Similarly, in 2020, 2021, and 2022, complaints were filed with the Federal Trade Commission ("FTC") regarding the Company's allegedly unfair and deceptive advertising of AR-15 Rifles.[51]

99. However, Buffalo's lawsuit, the lawsuits related to the Highland Park shooting, the Committee's investigation, and the FTC complaints are only the most recent developments in Smith & Wesson's significant exposure to liability.

100. For example: (i) courts in Delaware, Ohio, and California have ruled that gun manufacturers are not protected by the PLCAA and face liability for "public nuisance" claims related to the destruction created by firearms they have manufactured;[52] (ii) on July 2, 2021, the

---

[49] *See Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 202 A.3d 262 (2019) (PLCAA did not bar plaintiffs' claims that defendants violated the Connecticut Unfair Trade Practices Act); Committee on Oversight and Reform, *Memorandum: The Committee's Investigation into Gun Industry Practices and Profits*, at 10-11, 14 (July 27, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf (providing examples of false and/or misleading advertising by Smith & Wesson).
[50] Letter from Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform, to Mark P. Smith, President and Chief Executive Officer, *Smith & Wesson Brands, Inc.* (August 1, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022-08-01.CBM%20to%20Smith-Smith%20and%20Wesson%20re%20Subpoena.pdf.
[51] *See* Everytown Law, FTC Complaint (Mar. 31, 2020), available at https://everytownlaw.org/documents/2020/05/ftc-letter.pdf/; Everytown Law, FTC Complaint (Aug. 17, 2021), available at https://t.e2ma.net/click/de38sg/t67nfh/5jejav; Smith & Wesson, Form 10-K at 26 (June 22, 2023), available at https://www.sec.gov/Archives/edgar/data/1092796/000095017023029412/swbi-20230430.htm.
[52] *Sills v. Smith & Wesson Corp.*, 2000 Del. Super. LEXIS 444 (Super. Ct. Dec. 1, 2000) (denying defendants' motions to dismiss claims brought by a mayor and city for damages resulting from destruction attributed to handguns); *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) (allowing public nuisance claim to proceed because the "complaint alleged that

---

    SWBI_000000027

California Superior Court for San Diego County ruled that victims of the 2019 Chabad of Poway synagogue shooting could sue Smith & Wesson (*i.e.*, the Company was not protected by the PLCAA) for choosing to design its rifle in a manner that could easily be modified to fire automatically and for advertising that design;[53] (iii) the Company continues to face a $10 billion lawsuit by Mexico, in connection with its firearms being used by drug cartels;[54] (iv) on May 25, 2022, the Northern District of New York ruled that firearm sellers, manufacturers and distributors may be sued by the state, cities, or individuals for creating a "public nuisance" that endangers the public's safety and health;[55] (v) on July 22, 2022, California's Governor, Gavin Newsom, signed into law a bill that will make Smith & Wesson liable for $10,000 in damages and attorneys' fees for each AR-15 Rifle the Company has manufactured being distributed or sold in California;[56] and (vi)

appellees created a nuisance through their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market" and thus that the manufacturers "control[led] the creation and supply of this illegal, secondary market for firearms, not the actual use of the firearms that cause injury"); *Ileto v. Glock Inc.*, 349 F.3d 1191 (9th Cir. 2003) (reversing dismissal of public nuisance suit against gun manufacturer because, under California law, "the nuisance claim rests on the defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating the legal gun market in order to take advantage of re-sales to distributors that they know or should know will in turn sell to illegal buyers").

[53] *Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL, Dkt. No. 289 (Cal. Supr. Ct. San Diego, July 2, 2021) (order denying motion to dismiss); Brendan Pierson, *Smith & Wesson must face synagogue shooting victims' suit*, REUTERS (July 8, 2021), https://www.reuters.com/legal/litigation/smith-wesson-must-face-synagogue-shooting-victims-suit-2021-07-08/.

[54] Catton, et al., *Mexico Sues Smith & Wesson and Glock Over Cartel Violence*, BLOOMBERG (Aug. 4, 2021), https://www.bloomberg.com/news/articles/2021-08-04/mexico-sues-smith-wesson-and-glock-over-smuggled-firearms; Nate Raymond, *U.S. gun makers urge judge to throw out Mexico's $10 billion lawsuit,* REUTERS (April 12, 2022), https://www.reuters.com/world/americas/us-gunmakers-ask-judge-toss-mexicos-10-billion-lawsuit-2022-04-12/; MND Staff, *Mexico to appeal after US judge dismisses lawsuit against gun manufacturers*, MEXICO NEWS DAILY (Oct. 3, 2022), available at https://mexiconewsdaily.com/news/mexico-to-appeal-after-us-judge-dismisses-lawsuit-against-gun-manufacturers/.

[55] *Nat'l Shooting Sports Found., Inc. v. James*, 2022 U.S. Dist. LEXIS 93541 (N.D.N.Y. May 25, 2022); Nate Raymond, *Gunmakers lose challenge to New York law allowing lawsuits against industry*, REUTERS (May 25, 2022), https://www.reuters.com/world/us/gun-makers-lose-challenge-new-york-law-allowing-lawsuits-against-industry-2022-05-25/.

[56] California Senate, *Senate Bill 1327* (July 22, 2022), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220SB1327; Hannah Wiley, *Newsom signs gun law modeled after Texas abortion ban, setting up Supreme Court fight*, LA TIMES (July 22, 2022), https://www.latimes.com/california/story/2022-07-22/newsom-signs-gun-bill-modeled-after-texas-abortion-ban-setting-up; Erwin Chemerinsky, *Op-Ed: Is California's new gun law, modeled after the Texas abortion law, constitutional?*, LA TIMES (July 23, 2022), https://www.latimes.com/opinion/story/2022-07-23/gun-restrictions-newsom-private-lawsuits-texas-law.

- 27 -

on December 27, 2022, the District of New Jersey granted the State of New Jersey's motion to dismiss Smith & Wesson's lawsuit to block New Jersey's attorney general from enforcing a subpoena to investigate whether the company committed fraud while advertising firearms to consumers.[57]

101.    Even those cases that do not directly involve Smith & Wesson should serve as a dire warning to the Individual Defendants about the risks the Company faces–*i.e.*, red flags of the exposure liability that the Company's manufacturing, marketing, and sales of AR-15 Rifles has and continues to cause.

**IV.    BY FAILING TO TAKE ACTION IN RESPONSE TO NUMEROUS RED FLAGS CONCERNING THE RISKS OF MANUFACTURING, MARKETING, AND SELLING AR-15 RIFLES, THE DIRECTOR DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

102.    The Board's most fundamental responsibility is to ensure that the Company is operating within the law. Indeed, Smith & Wesson's directors owe fiduciary duties to the Company and its stockholders to conduct adequate oversight to ensure that Smith & Wesson is not flouting any governing laws and regulations, or otherwise operating in such a manner that it would be exposed to significant liability.

103.    In carrying out these duties, the Board must exercise its duty of oversight by creating information and reporting systems to monitor all "mission critical" aspects of the business. As a highly regulated firearm manufacturer, one "mission critical" aspect of Smith & Wesson's business is legal compliance, which is required for the Company to be protected from liability for crimes that are committed with Smith & Wesson products under the PLCAA. In fact, the Company's Code of Conduct states: "Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built."

104.    Thus, it is of utmost importance to the Company and its stockholders that the Board maintains an information and reporting system such that it can monitor the "mission critical" risk of

---

[57]    *See Smith & Wesson Brands, Inc. v. Grewal*, 2022 WL 17959579 (D.N.J. Dec. 27, 2022).

SWBI_000000029

preventing exposure to liability outside the protection afforded to Smith & Wesson by the PLCAA through the Company's violation of state and local law.

105.    Despite the importance of operating under the protections of the PLCAA, the Director Defendants have no system for monitoring or tracking injuries and deaths caused by Smith & Wesson AR-15 Rifles, whether from accidental discharge, product malfunction, or deliberate use, nor do they have any means for tracking crimes committed with their products.[58]

106.    In fact, the Board's willful failure to monitor or track injuries and deaths caused by Smith & Wesson AR-15 Rifles causes the Director Defendants to be blind to the potential liability that the Company faces in connection with known: (i) violations of various state and local laws banning AR-15 Rifles;[59] (ii) violations of various state and local consumer protection laws prohibiting deceptive, false, and/or misleading marketing of AR-15 Rifles;[60] and (iii) illicit diversion of its AR-15 Rifles to juveniles, criminals, and other persons who are prohibited from owning guns.[61]

107.    The Individual Defendants' oversight failures also violate internal Company policies and corporate governance documents, including the: (i) Corporate Governance Guidelines; (ii) Audit Committee Charter; and (iii) ESG Committee Charter.

108.    Smith & Wesson's Corporate Governance Guidelines state, in relevant part:

> The Board, as a whole and through its committees, has responsibility for the oversight of risk management. In its oversight role, the Board's involvement in the Company's business strategy and strategic plans plays a key role in its oversight of risk management, its assessment of management's risk appetite, and its determination of the appropriate level of enterprise risk. The Board requires periodic updates from senior management and from outside advisors regarding the various risks the Company faces, including operational, economic, financial, legal, regulatory, and competitive risks.[62]

[58]    Committee, Report at 20 (July 27, 2022), available at https://docs.house.gov/meetings/GO/GO00/20220727/115024/HHRG-117-GO00-20220727-SD005.pdf.

[59]    *See, e.g., Goldstein v. Earnest*, No. 37-2020-00016638-CU-PO-CTL, Dkt. No. 289 (Cal. Supr. Ct. San Diego, July 2, 2021) (order denying motion to dismiss); Highland Park Cases.

[60]    *Id.*

[61]    *See, e.g., The City of Buffalo v. Smith & Wesson Brands, Inc.*, Index No. 815602/2022 (N.Y. Sup. Erie County); *The City of Buffalo v. Smith & Wesson Brands, Inc.*, No. 23-cv-00066-FPG (W.D.N.Y.).

[62]    Corporate Governance Guidelines at 4.

- 29 -

SWBI_000000030

109. By not having any reporting channel related to the "mission critical" risk of preventing exposure to liability outside the protection afforded to Smith & Wesson by the PLCAA through the Company's violation of state and local law, the Director Defendants are in clear violation of the Corporate Governance Guidelines.

110. In describing the Audit Committee's duties and responsibilities, Smith & Wesson's Audit Committee Charter states, in relevant part, that it must:

> Discuss with management and the independent auditor the Company's major financial risk exposures, the guidelines and policies by which risk assessment and management is undertaken, and the steps management has taken to monitor and control risk exposure.[63]

111. As the Company produced no Audit Committee minutes in response to Plaintiffs' Section 16.02 demand, it is reasonable to infer that there were no such minutes related to Smith & Wesson's potential exposure to liability in connection with its manufacturing, marketing, or sales of AR-15 Rifles.

112. Thus, by admittedly not monitoring the "mission critical" risk of preventing exposure to liability outside the protection afforded to Smith & Wesson by the PLCAA through the Company's violation of state and local law, and not otherwise monitoring risks related to AR-15 Rifles, Director Defendants are in clear violation of the Audit Committee Charter requirement that its members "monitor and control risk exposure."

113. In describing the ESG Committee's duties and responsibilities, Smith & Wesson's ESG Committee Charter states, in relevant part:

> The purpose of the Environmental, Social, and Governance, or ESG, Committee is to assist the Board of Directors (the "Board") and its various committees, as applicable, in fulfilling the oversight responsibilities of the Board with various environmental, social, health, safety, and governance policies and operational control matters relevant to the Company, or ESG Matters, particularly those that do not come within the purview of other standing committees of the Board or the Board itself. … The Committee shall report to the Board current and emerging topics relating to ESG Matters that may affect the business, performance, or public

---

[63] Audit Committee Charter at 4.

- 30 -

SWBI_000000031

image of the Company or are otherwise pertinent to the Company and its stakeholders.[64]

114.    In response to Plaintiffs' Section 16.02 demand, the Company produced minutes from one March 20, 2023 meeting of the ESG Committee, revealing that its members did not seriously consider Smith & Wesson's litigation risk whatsoever. In fact, in minutes that Plaintiffs infer must represent the only discussion that the ESG Committee had about the Company's exposure to liability, its members concluded summarily that all "issues related to domestic litigation … international litigation … [and] regulatory and investor issues … [are] driven by gun control activists."[65]

115.    Further, by not having any reporting channel related to the "mission critical" risk of preventing exposure to liability outside the protection afforded to Smith & Wesson by the PLCAA through the Company's violation of state and local law, the Director Defendants are in clear violation of the ESG Committee Charter.

116.    The Individual Defendants' lack of oversight related to the Company's "mission critical" risk of exposure to liability outside the protections of the PLCAA in connection with its manufacturing, marketing, and sales of AR-15 Rifles is also contrary to the interests of the Company, and contrary to the express position of many Smith & Wesson stockholders.

117.    Since at least 2018, through stockholder proposals and public comments, numerous Smith & Wesson stockholders (including Plaintiffs, other members of the Interfaith Center on Corporate Responsibility, BlackRock, Glass Lewis, and Majority Action) have advocated for the Board to monitor the risks facing the Company through the use of its AR-15 Rifles to perpetrate gun violence in the U.S.

118.    Despite the Director Defendants consistently recommending that stockholders vote against these proposals, they have garnered significant support, with Smith & Wesson even approving the 2018 stockholder proposal that the Board issue a report providing: (i) evidence of monitoring of violent events associated with products produced by the company; (ii) efforts to

---

[64]    ESG Committee Charter at 1, 3.
[65]    SWBI_107.

SWBI_000000032

research and produce safer guns and gun products; and (iii) an assessment of the corporate reputational and financial risks related to gun violence in the U.S.

119.    On February 8, 2019, the Board issued the Shareholder Requested Report on Product Safety Measures and Monitoring of Industry Trends ("Monitoring Report"), which further established the Director Defendants failure to monitor legal risks related to the Company's manufacturing, marketing, and sales of AR-15 Rifles.[66]

120.    While noting the Board's "oversight of risk management, its assessment of management's risk appetite, and its determination of the appropriate level of enterprise risk," the only "reputational and financial risks" that the Monitoring Report considered were those related to its profits and sales.

121.    Indeed, despite representing a breach of fiduciary duty to the Company and its stockholders who voted in favor of the 2018 stockholder proposal, the Monitoring Report explicitly makes clear that the Board considers customer interests before those to whom they owe a fiduciary duty:

> The Company's reputation as a strong defender of the Second Amendment is not worth risking for a vague goal of improving the Company's reputation among non-customers or special interest groups with an anti-Second Amendment agenda. [Smith & Wesson's] customer base of knowledgeable, law abiding firearms purchasers does not blame Smith & Wesson, or any other firearms brand, for the malfeasance of criminals or the actions of the mentally or emotionally impaired. In fact, they are more inclined to support greater access to firearms by private citizens to help prevent and protect themselves from these tragedies.

> Moreover, [Smith & Wesson] disagrees that it must adopt elements of a gun control agenda, or otherwise appease factions that are fundamentally opposed to private gun ownership, in order to prove that the Company understands and is taking appropriate steps to mitigate the risks that accompany manufacturing firearms in the United States. In this context, reputation risk management is not an endeavor meaningfully associated with winning the support of one's detractors.

122.    In other words, rather than explaining the Board's oversight and/or monitoring of risks related to the Company's manufacturing, marketing, and sales of AR-15 Rifles, the Monitoring

---

[66] Smith & Wesson, Monitoring Report (Feb. 9, 2019), available at https://www.sec.gov/Archives/edgar/data/1092796/000119312519032245/d704097dex991.htm.

Report establishes that the Board knowingly decided to prioritize short-term profits and sales over the long-term legal risks resulting from the same.

123. And, at the Company's annual meetings from 2018 to 2023, stockholder proposals related to the Board's oversight of AR-15 Rifle-related risks received votes in favor from an average of 40.6% of voting shares.

124. Whether or not these stockholder proposals were approved, they represent clear proof that a significant portion of the Company's stockholders have concluded that the Director Defendants are violating their duty of oversight, and that it would be in their interest for the Board to monitor the risks facing the Company in connection with its manufacturing, marketing, and sales of AR-15 Rifles.

125. Moreover, by acting contrary to the interests of the Company and its stockholders, the Director Defendants are violating their most "basic responsibility" under Smith & Wesson's Corporate Governance Guidelines, which provide, in relevant part:

> The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its stockholders.[67]

126. Instead, by assuming that the short-term profits from the Company's manufacturing, marketing, and sales of AR-15 Rifles outweighs the resulting risks of exposure to liability (without monitoring or even considering those risks), the Director Defendants have resolved to maintain the status quo and violate various state and local laws.

127. Notwithstanding the clear evidence to the contrary, the Company's President and Chief Executive Officer, Mark Smith, continues to precipitate the abject management failures that threaten Smith & Wesson, publicly stating that "a Smith & Wesson firearm has never broken into a home; a Smith & Wesson firearm has never assaulted a woman out for a late-night run in the city; a Smith & Wesson firearm has never carjacked an unsuspecting driver stopped at a traffic light.

///

///

---

[67] Corporate Governance Guidelines at 2.

SWBI_000000034

Instead, Smith & Wesson provides these citizens with the means to protect themselves and their families."[68]

128.    The release of this statement makes clear that the Company's Board and executives either lack a reporting system to alert them about the real-world consequences and liability faced by the Company in connection with the marketed use of its AR-15 Rifles, or they affirmatively decided that the Company's short-term profits from the sale of AR-15 Rifles outweigh the substantial and devastating likelihood of liability that this practice has caused, and will cause, the Company to confront (to say little of the lack of humanity in recognizing the undisputable fact that the AR-15 is, and has proven to be time and again, a mass killing machine with no other utility).

129.    In fact, a comparison between the Company's stock price and the S&P 500 since September 2021 shows that the market has already begun factoring mismanagement and concerns about liability into Smith & Wesson's future performance:



130.    Despite Smith & Wesson's recent reporting of substantial profits related to manufacturing, marketing, and sales of AR-15 Rifles, it is clear that these practices represent a

///

[68]   Mark Smith, *Smith & Wesson CEO Issues Strong Statement in the Face of 2nd Amendment Attacks* (Aug. 15, 2022), available at https://www.smith-wesson.com/sites/default/files/press-release/Smith%20%26%20Wesson%20CEO%20Issues%20Strong%20Statement%20in%20the%20Face%20of%202nd%20Amendment%20Attacks_8_15_Final.pdf.

- 34 -

SWBI_000000035

foreseeable long-term risk to the Company, could cause the Company irreparable harm, and the Board owes the Company and its stockholders a duty to prevent such harm from materializing.

131.    Several examples of this foreseeable harm include: (i) the loss of institutional investor funds;[69] (ii) exposure to regulatory scrutiny, lawsuits, and negative press;[70] and (iii) exposure to substantial liability that causes the Company great financial harm, up to and including bankruptcy.[71] Indeed, the imminent and devastating harm that the Company is facing from its manufacturing, marketing, and sales of AR-15 Rifles could not be much more foreseeable–*i.e.*, the recent $73 million settlement between now-bankrupt Remington Arms and the families of Sandy Hook victims based on exactly the same marketing practices used by the Company offers a stark warning.[72]

132.    The Individual Defendants' decision to allow the Company to manufacture, market, and sell AR-15 Rifles has exposed Smith & Wesson to a substantial likelihood of liability. Now, the Board's inaction will ensure that the status quo is maintained, causing the Company's current actual harm (*e.g.*, cost of defending against current investigations, lawsuits, and regulatory scrutiny) to result in further and irreparable harm.

---

[69]    *See* Antoine Gara, *Years After Sandy Hook Shooting, Pension Fund CalSTRS Exits Cerberus-Backed Remington*, FORBES.COM (June 8, 2015), https://www.forbes.com/sites/antoinegara/2015/06/08/years-after-sandy-hook-shooting-pension-fund-calstrs-exits-cerberus-backed-remington/?sh=2d3835ed1d2e.

[70]    *See, e.g.*, Canipe, et al., *What the deadliest mass shootings have in common*, AXIOS (Sept. 7, 2019), https://www.axios.com/2019/09/07/deadliest-mass-shootings-common; Sorkin, et al., *The Most Important Lawsuit You've Never Heard Of*, NY TIMES (Mar. 2, 2021), https://www.nytimes.com/2021/03/02/business/dealbook/new-jersey-lawsuit-smith-wesson.html; Timothy L. O'Brien, *Uvalde Families Should Take Gunmakers to Court*, WASHINGTON POST (May 26, 2022), https://www.washingtonpost.com/business/uvalde-families-should-take-gunmakers-to-court/2022/05/26/fcb38c10-dce7-11ec-bc35-a91d0a94923b_story.html.

[71]    *See, e.g.*, *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 202 A.3d 262 (2019); Rojas, et al., *Sandy Hook Families Settle With Gunmaker for $73 Million Over Massacre*, NY TIMES (Feb. 15, 2022), https://www.nytimes.com/2022/02/15/nyregion/sandy-hook-families-settlement.html; Jesse Barron, *How America's Oldest Gun Maker Went Bankrupt: A Financial Engineering Mystery*, NY TIMES (May 1, 2019), https://www.nytimes.com/interactive/2019/05/01/magazine/remington-guns-jobs-huntsville.html; Gladstone, et al., *Gun Maker Remington Preps for Bankruptcy, Seeks Sale to Navajo Nation*, WALL STREET JOURNAL (June 26, 2020), https://www.wsj.com/articles/gun-maker-remington-preps-for-bankruptcy-seeks-sale-to-navajo-nation-11593186468.

[72]    Kim Bellware, *Sandy Hook families announce $73 million settlement with Remington Arms in landmark agreement*, WASHINGTON POST (Feb. 15, 2022), available at https://www.washingtonpost.com/nation/2022/02/15/remington-sandy-hook-settlement/.

SWBI_000000036

133. Meanwhile, the Company's disclosures about Board-level oversight of material risks have been, at best, materially misleading.

134. Since at least 2021, when the ESG Committee was formed, the Company has disclosed that the ESG Committee "[r]eviews emerging risks associated with ESG matters."[73]

135. Notwithstanding its disclosures to the contrary, the ESG Committee does not consider the material risks facing the Company through its manufacturing, marketing, and sale of AR-15 Rifles.

136. Indeed, in response to the Plaintiffs' Section 16.02 Demand, the Company produced minutes from a March 20, 2023 meeting of the ESG Committee that reveals that the members did not seriously consider risk, concluding summarily that all "issues related to domestic litigation … international litigation … [and] regulatory and investor issues … to be driven by gun control activists."[74]

137. Such a perversion of the risks facing the Company is entirely inconsistent with the review of emerging risks.

138. In fact, the ESG Committee's characterization of risks facing the Company reveals that they are pre-determined to be non-material, rather than reviewed as potentially material risks, either through an objective process and/or with the assistance of independent risk consultants.

139. The same lack of oversight is true of the Board's consideration of material risks.

140. Indeed, in response to the Plaintiffs' Section 16.02 Demand, the Company produced minutes from a December 13, 2022 meeting of the Board that reveals that the members considered "negativity in the media about the Company [to be] largely driven by gun control groups…."[75]

141. Even the Digimind media monitoring report that was commissioned by the Board was limited in scope to assessing the "reputational risks" that the Company faced in connection with gun violence in the United States—it did not consider or otherwise provide any information about

---

[73] Smith & Wesson, Schedule 14(A) Proxy Statement at 10 (Aug. 3, 2022), available at https://www.sec.gov/Archives/edgar/data/1092796/000156459022027611/swbi-def14a_20220912.htm.
[74] SWBI_107.
[75] SWBI_109.

SWBI_000000037

the real material risks facing the Company in connection with its exposure to liability for manufacturing, marketing, and selling AR-15 Rifles used to commit gun violence.[76]

142. The reason, put simply, is that the Individual Defendants never considered, or simply ignored, such risks in their single-minded pursuit of short-term profit.[77]

143. Accordingly, Smith & Wesson stockholders are being materially misled about the ESG Committee's lack of oversight and/or consideration of risks associated with ESG matters.

144. Moreover, Smith & Wesson stockholders are being deprived of accurate disclosures regarding the Individual Defendants' lack of consideration of material risks facing the Company as a result of its manufacturing, marketing, and sale of AR-15 Rifles.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

145. Plaintiffs bring this action derivatively in the right and for the benefit of Smith & Wesson to redress injuries suffered, and to be suffered, by Smith & Wesson as a direct result of breaches of fiduciary duty by the Individual Defendants.

146. Smith & Wesson is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147. Plaintiffs will adequately and fairly represent the interests of Smith & Wesson in enforcing and prosecuting its rights.

148. The wrongful acts complained of herein subject, and will persist in subjecting, the Company to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

149. Plaintiffs were stockholders of Smith & Wesson at the time of the wrongdoing complained of, have continuously been stockholders of the company since that time, and are current Smith & Wesson shareholders.

150. Plaintiffs repeat and reallege each allegation above as if set forth in full in this Derivative and Demand Futility Allegations section.

---

[76] SWBI_123-133.
[77] It is reasonable to infer that exculpatory information not reflected in the production of board-level books and records does not exist. *See Teamsters Local 443 Health Serv's & Ins. Plan v. Chou*, C.A. No. 2019-0816-SG, 2020 WL 5028065, at *24 n.314 (Del. Ch. Aug. 24, 2020).

SWBI_000000038

151.    Plaintiffs did not make a demand on the Board to institute this action because pre-suit demand is excused.

152.    Demand is excused because there exists a reasonable doubt that, at a minimum, at least half of the Board at the time of the filing of this Complaint could properly exercise independent and disinterested business judgment in responding to a demand.

153.    At the time this action was filed, the Board consisted of the following seven members: Britt, Diaz, Lohmeier, Monheit, Scott, Smith, and Suggs (together, the "Demand Board"). Demand is therefore futile if at least four out of the seven members of the Demand Board lack independence, are not disinterested, or both.

154.    As set forth below, the Demand Board could not impartially consider and decide whether to assert the claims brought herein because a majority of those directors face a substantial likelihood of liability.

I.    **BAD FAITH FAILURE TO RESPOND TO KNOWN VIOLATIONS OF FEDERAL, STATE, AND LOCAL LAW**

155.    A Demand on the current Board would be futile because all seven members of the Demand Board–Britt, Diaz, Lohmeier, Monheit, Scott, Smith, and Suggs–face a substantial risk of liability for acting in bad faith by knowingly permitting the Company to manufacture, market, and/or sell AR-15 Rifles in violation of federal, state, and local laws banning individuals from purchasing, using, and/or possessing the same, and for failing to ensure that the Company operated in such a manner that it would be protected from liability under the PLCAA.

156.    Each member of the Demand Board has been a member of Smith & Wesson's Board while the Company has, and continues to, manufacture, market, and sell AR-15 Rifles. Furthermore, each member of the Demand Board has been on the Board while the Company faces pending lawsuits in connection with its manufacturing, marketing, and selling of AR-15 Rifles in violation of federal, state, and local laws.

157.    Moreover, each member of the Demand Board has been a member of the Board while the Company has, and continues to, face lawsuits regarding Smith & Wesson's manufacturing,

SWBI_000000039

marketing, and selling of AR-15 Rifles that are used by the perpetrators of mass shootings, in jurisdictions that ban individuals from purchasing, using, and/or possessing AR-15 Rifles, preventing the protection from liability otherwise afforded to the Company under the PLCAA, and exposing the Company to a substantial likelihood of liability.

158.    Scott, who was on the Board when the Company entered into the 2000 Settlement Agreement, faces additional risk, because he was not only aware of the Company's violation of federal, state, and local law in connection with its manufacturing, marketing, and selling of AR-15 Rifles, but was serving on the Board at the time the Company reached a settlement with the federal government requiring that it "[n]ot market any firearm in a way that would make the firearm particularly appealing to juveniles or criminals."[78]

159.    Britt, Diaz, Monheit, Scott, Smith, and Suggs, who were on the Board when the Committee investigated the Company's sale and marketing of AR-15 Rifles, and issued the Committee Report detailing Smith & Wesson's continued marketing of AR-15 Rifles to juveniles and/or criminals in violation of the 2000 Settlement Agreement and various state consumer protection laws, were thus fully aware that the Company's practices were at risk of exposing Smith & Wesson to liability outside the protection of the PLCAA. However, despite being fully cognizant– and explicitly warned–of the significant exposure to liability caused by the Company's marketing practices, the Director Defendants failed to act to ensure that Smith & Wesson would stay within the boundaries of PLCAA protection.

160.    Thus, any lawsuit initiated to remedy the misconduct complained of herein would expose all seven current Board members to significant personal liability for their bad faith breaches of fiduciary duties and other misconduct.

///

///

---

[78]   2000 Settlement Agreement (Mar. 17, 2000), available at sec.gov/Archives/edgar/data/1092796/000095015301500879/p65473ex10-14.txt.

SWBI_000000040

161.    For these willful failures, each member of the Demand Board faces a substantial likelihood of personal liability, and cannot disinterestedly evaluate a litigation demand against them for the same claims.

162.    Accordingly, demand is futile, and thus, excused.

**II.    LACK OF INDEPENDENCE AMONG DEMAND BOARD MEMBERS**

163.    A majority of the Demand Board also has ties to the gun industry that prevent those members of the Board–Smith, Scott, Lohmeier, and Monheit–from being capable of disinterestedly evaluating a litigation demand.

164.    Smith and Scott are, or have been, employed as executives for the Company and, thus, cannot be considered independent members of the Board.

165.    Lohmeier is also a director for ammunitions manufacturer Nammo Defense Systems Inc., and, thus, cannot possibly escape her bias in connection with the gun industry position related to the manufacture, marketing, and sale of AR-15 Rifles, such that she could disinterestedly evaluate a litigation demand.

166.    Monheit is a director for American Outdoor Brands, Inc., which was created from the same company as Smith & Wesson, and is Vice Chairman for That's Entertainment Corp., which offers entertainment based on its virtual interactive shooting experience utilizing laser technology-based replica firearms. Based on Monheit's longstanding connection with the Company, and his current position on the Board of a firearms-related company, he cannot possibly escape his bias in connection with the gun industry position related to the manufacture, marketing, and sale of AR-15 Rifles, such that he could disinterestedly evaluate a litigation demand.

167.    Smith, Scott, Lohmeier, and Monheit make up a majority of the Demand Board, and cannot disinterestedly evaluate a litigation demand related to the Company's manufacturing, marketing, and sales of AR-15 Rifles.

168.    Furthermore, as members of the Board when the Monitoring Report was issued, Scott, Monheit, and Britt have already explicitly stated that a demand related to the Company's manufacturing, marketing, and sales of AR-15 Rifles would be futile, which offers the following

- 40 -

SWBI_000000041

conclusion in connection with a stockholder-approved assessment of "corporate reputational and financial risks related to gun violence in the U.S.":

> To summarize, [Smith & Wesson's] reputation among firearm buyers and Second Amendment supporters is more critical to the success of the Company and the enhancement of shareholder value than its reputation among industry detractors and special interest groups with a political agenda. In fact, efforts to improve the Company's reputation among its critics would not only be futile but would hurt the Company's business as it did 19 years ago.

169. Accordingly, as members of the Board that issued the Monitoring Report, Scott, Monheit, and Britt cannot disinterestedly evaluate a litigation demand related to the Company's manufacturing, marketing, and sales of AR-15 Rifles.

170. Finally, in August 2023, each member of the Demand Board was on the Board when it "unanimously recommend[ed]" voting against a stockholder proposal to conduct a third-party Human Rights Impact assessment, based on their assertions that "it would require [the Company] to reduce [its] lawful product offerings," "gun control activists … want to ban entire classes of commonly-owned firearms," and the proponents' "absolutist views [are] inconsistent with individuals' fundamental [Second Amendment] right to provide for their own security."[79]

171. As no member of the Demand Board could reasonably be expected to consider a litigation demand that they have already deemed to be inconsistent with rights under the U.S. Constitution, they also cannot disinterestedly evaluate a litigation demand regarding the same underlying issues (*i.e.*, the significant exposure to liability and violation of federal, state, and local laws caused by Smith & Wesson's manufacturing, marketing, and sales of AR-15 Rifles).

172. Accordingly, demand is futile, and thus, excused.

### CLAIMS FOR RELIEF

### COUNT I
*Against the Director Defendants for Breach of Fiduciary Duty*

173. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein. The Director Defendants each owe Smith & Wesson and its

---

[79] Smith & Wesson, *Schedule 14(A)* at 52-56 (Aug. 10, 2023), available at https://www.sec.gov/Archives/edgar/data/1092796/000095017023041366/swbi-20230810.htm.

SWBI_000000042

stockholders the highest fiduciary duties of loyalty, good faith, fair dealing, due care, and oversight in managing and administering the Company's affairs.

174. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Smith & Wesson the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of Smith & Wesson's compliance with federal, state, and local laws regarding the manufacturing, marketing, and sales of AR-15 Rifles.

175. In addition, the Director Defendants owed and owe specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees (including, but not limited to, those of the ESG Committee) that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the Company from being exposed to the substantial likelihood of liability and the consequent harm to the Company alleged herein.

176. The Director Defendants knowingly, intentionally, and fraudulently violated and breached their fiduciary duties of good faith, fair dealing, loyalty, and due care by affirmatively and repeatedly ignoring red flags related to the use of AR-15 Rifles by the perpetrators of mass shootings in jurisdictions with laws that ban the purchase, ownership, and use of AR-15 Rifles, preventing the application of the PLCAA, and exposing the Company to a significant likelihood of liability.

177. Moreover, the Director Defendants intentionally decided not to take any action related to the same, notwithstanding knowledge of significant stockholder support for related stockholder proposals.

178. By ignoring and/or disregarding the Company's stockholders' concerns, the Director Defendants placed the interests of customers above those of the Company and its stockholders, acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

179. As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibility, Smith & Wesson has sustained, and will continue to sustain, significant damages—both financially and to its corporate

SWBI_000000043

image and goodwill. Such damages to Smith & Wesson caused by the Director Defendants include and will include, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, reputational harm, and other liabilities described herein.

180.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

181.    Plaintiffs, on behalf of Smith & Wesson, have no adequate remedy at law.

**COUNT II**
*Against the Officer Defendants for Breach of Fiduciary Duty of Loyalty*

182.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

183.    The Officer Defendants, as current and former officers of Smith & Wesson, all owed and owe fiduciary duties to Smith & Wesson and its stockholders. By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe Smith & Wesson the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with federal, state, and local laws regarding the manufacturing, marketing, and sales of AR-15 Rifles.

184.    In addition, the Officer Defendants owed and owe specific fiduciary duties as defined by the Company's corporate governance documents that, had they been discharged in accordance with the Officer Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged herein.

185.    The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities by affirmatively and repeatedly ignoring red flags related to the use of AR-15 Rifles by the perpetrators of mass shootings in jurisdictions with laws that ban the purchase, ownership, and use of AR-15 Rifles, preventing the application of the PLCAA, and exposing the Company to a significant likelihood of liability.

186.    As a direct and proximate result of the Officer Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibility, Smith & Wesson has

SWBI_000000044

sustained, and will continue to sustain, significant damages—both financially and to its corporate image and goodwill. Such damages to Smith & Wesson caused by the Officer Defendants include and will include, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, reputational harm, and other liabilities described herein.

187. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

188. Plaintiffs, on behalf of Smith & Wesson, have no adequate remedy at law.

## COUNT III
### Against the Officer Defendants for Breach of Fiduciary Duty of Care

189. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

190. The Officer Defendants, as current and former officers of Smith & Wesson, all owed and owe fiduciary duties to Smith & Wesson and its stockholders. By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe Smith & Wesson the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with federal, state, and local laws regarding the manufacturing, marketing, and sales of AR-15 Rifles.

191. In addition, the Officer Defendants owed and owe specific fiduciary duties as defined by the Company's corporate governance documents that, had they been discharged in accordance with the Officer Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged herein.

192. The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities by affirmatively and repeatedly ignoring red flags related to the use of AR-15 Rifles by the perpetrators of mass shootings in jurisdictions with laws that ban the purchase, ownership, and use of AR-15 Rifles, preventing the application of the PLCAA, and exposing the Company to a significant likelihood of liability.

SWBI_000000045

193. As a direct and proximate result of the Officer Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibility, Smith & Wesson has sustained, and will continue to sustain, significant damages—both financially and to its corporate image and goodwill. Such damages to Smith & Wesson caused by the Officer Defendants include and will include, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, reputational harm, and other liabilities described herein.

194. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

195. For these reasons, the Officer Defendants are liable to the Company for breaches of fiduciary duty.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Smith & Wesson, demand judgment as follows:

A. Determining that this action is a proper derivative action maintainable under the law and that demand on the Smith & Wesson Board is excused as futile;

B. Finding the Director Defendants liable for breaching their fiduciary duties by knowingly allowing Smith & Wesson to violate various federal, state, and local laws through its manufacturing, marketing, and sales of AR-15 Rifles, preventing any protection from liability otherwise afforded under the PLCAA;

C. Finding the Officer Defendants liable for breaching their fiduciary duties by knowingly allowing Smith & Wesson to violate various federal, state, and local laws through its manufacturing, marketing, and sales of AR-15 Rifles, preventing any protection from liability otherwise afforded under the PLCAA;

D. Finding the Officer Defendants liable for breaching their fiduciary duties by knowingly allowing Smith & Wesson to not comply with various federal, state, and local laws through its manufacturing, marketing, and sales of AR-15 Rifles, preventing any protection from liability otherwise afforded under the PLCAA;

- 45 -

SWBI_000000046

E.     Directing Smith & Wesson to take all necessary actions to reform and improve its compliance procedures and governance policies to comply with applicable laws and to protect Smith & Wesson and its stockholders from a repeat of the damaging events described herein;

F.     Awarding to Smith & Wesson restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' consultants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  December 5, 2023

**MATTHEW L. SHARP, LTD.**


_____/s/ *Matthew L. Sharp*_____
Matthew L. Sharp, Esq.
Nevada Bar No. 4746
432 Ridge Street
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

**NEWMAN FERRARA LLP**
Jeffrey M. Norton, *Pro Hac Vice Forthcoming*
Benjamin D. Baker, *Pro Hac Vice Forthcoming*
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400
jnorton@nfllp.com
bbaker@nfllp.com

*Attorneys for Plaintiffs*

**DISTRICT COURT**
**CLARK COUNTY NEVADA**

ADRIAN DOMINICAN SISTERS, SCHOOL SISTERS OF NOTRE DAME CENTRAL PACIFIC PROVINCE, SISTERS OF BON SECOURS USA, SISTERS OF ST. FRANCIS OF PHILADELPHIA, and SISTERS OF THE HOLY NAMES OF JESUS & MARY, U.S.-ONTARIO PROVINCE, derivatively on behalf of SMITH & WESSON BRANDS, INC.,

Plaintiff,

v.

MARK P. SMITH, KEVIN A. MAXWELL, SUSAN J. CUPERO, ROBERT L. SCOTT, ANITA D. BRITT, FRED M. DIAZ, MICHELLE J. LOHMEIER, BARRY M. MONHEIT, and DENIS G. SUGGS,

Defendants.

-and-

SMITH & WESSON BRANDS, INC., a Nevada Corporation,

Nominal Defendant.

Case No:
Dept No:

**AFFIDAVIT AND VERIFICATION**

STATE OF MICHIGAN )
) ss.
COUNTY OF LENAWEE )

I, SISTER CORINNE SANDERS, being duly sworn, do hereby state as follows:

1.     I am a Sister of the Adrian Dominican Sisters, a Plaintiff in the above-referenced Action. I make this Affidavit and Verification pursuant to Nev. R. Civ. P. 23.1(b) in connection with the filing of a Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty (the "Complaint");

2.     The Adrian Dominican Sisters currently hold shares of Smith & Wesson Brands, Inc. and have held such shares continuously during all relevant times alleged in the Complaint.

- 1 -

SWBI_000000048

3.    I have reviewed the Complaint and consulted with counsel.

4.    The facts alleged in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

5.    Neither I nor the Adrian Dominican Sisters have received, been promised, or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Adrian Dominican Sisters on the Adrian Dominican Sisters' behalf; or (ii) reimbursement, paid by the Adrian Dominican Sisters' attorneys, of actual and reasonable out-of-pocket expenses incurred by me directly in connection with prosecution of this action.

I make this Affidavit and Verification under penalty of perjury that the foregoing is true and correct.

Executed this _28_ day of _November_ , 2023.

_A. Corinne Sanders_
SISTER CORINNE SANDERS

SWORN TO AND SUBSCRIBED
before me this _28_ day of _November_, 2023.

_Rebecca M DuShane_
Notary Public

_7/16/2027_
My Commission Expires



REBECCA M DUSHANE
NOTARY PUBLIC
COUNTY OF
LENAWEE
My Commission Expires
JULY 16, 2027
Acting in the County of
Lenawee
STATE OF MICHIGAN

- 2 -

SWBI_000000049

**DISTRICT COURT**
**CLARK COUNTY NEVADA**

ADRIAN DOMINICAN SISTERS, SCHOOL SISTERS OF NOTRE DAME CENTRAL PACIFIC PROVINCE, SISTERS OF BON SECOURS USA, SISTERS OF ST. FRANCIS OF PHILADELPHIA, and SISTERS OF THE HOLY NAMES OF JESUS & MARY, U.S.-ONTARIO PROVINCE, derivatively on behalf of SMITH & WESSON BRANDS, INC.,

    Plaintiff,

    v.

MARK P. SMITH, KEVIN A. MAXWELL, SUSAN J. CUPERO, ROBERT L. SCOTT, ANITA D. BRITT, FRED M. DIAZ, MICHELLE J. LOHMEIER, BARRY M. MONHEIT, and DENIS G. SUGGS,

    Defendants.

    -and-

SMITH & WESSON BRANDS, INC., a Nevada Corporation,

    Nominal Defendant.

Case No:
Dept No:

**AFFIDAVIT AND VERIFICATION**

STATE OF MARYLAND    )
                   ) ss.
COUNTY OF HOWARD    )

I, SISTER ELAINE DAVIA, being duly sworn, do hereby state as follows:

1.    I am a Sister of the Sisters of Bon Secours USA, a Plaintiff in the above-referenced Action. I make this Affidavit and Verification pursuant to Nev. R. Civ. P. 23.1(b) in connection with the filing of a Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty (the "Complaint");

2.    The Sisters of Bon Secours USA currently hold shares of Smith & Wesson Brands, Inc. and have held such shares continuously during all relevant times alleged in the Complaint.

- 1 -

SWBI_000000050

3.    I have reviewed the Complaint and consulted with counsel.

4.    The facts alleged in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

5.    Neither I nor the Sisters of Bon Secours USA have received, been promised, or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Sisters of Bon Secours USA on the Sisters of Bon Secours USA's behalf; or (ii) reimbursement, paid by the Sisters of Bon Secours USA's attorneys, of actual and reasonable out-of-pocket expenses incurred by me directly in connection with prosecution of this action.

I make this Affidavit and Verification under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of November, 2023.

_Sr. Elaine Davia_
SISTER ELAINE DAVIA

SWORN TO AND SUBSCRIBED before me this 15 day of NOV , 2023.

_[signature]_
Notary Public

DEBRA M PETTUS
Notary Public - State of Maryland
Anne Arundel County
My Commission Expires May 11, 2026

My Commission Expires

- 2 -

SWBI_000000051

**DISTRICT COURT
CLARK COUNTY NEVADA**

ADRIAN DOMINICAN SISTERS, SCHOOL SISTERS OF NOTRE DAME CENTRAL PACIFIC PROVINCE, SISTERS OF BON SECOURS USA, SISTERS OF ST. FRANCIS OF PHILADELPHIA, and SISTERS OF THE HOLY NAMES OF JESUS & MARY, U.S.-ONTARIO PROVINCE, derivatively on behalf of SMITH & WESSON BRANDS, INC.,

               Plaintiff,

     v.

MARK P. SMITH, KEVIN A. MAXWELL, SUSAN J. CUPERO, ROBERT L. SCOTT, ANITA D. BRITT, FRED M. DIAZ, MICHELLE J. LOHMEIER, BARRY M. MONHEIT, and DENIS G. SUGGS,

               Defendants.

     -and-

SMITH & WESSON BRANDS, INC., a Nevada Corporation,

               Nominal Defendant.

Case No:
Dept No:

**AFFIDAVIT AND
VERIFICATION**

| STATE OF OREGON | ) | |
|---|---|---|
| | ) | ss. |
| COUNTY OF CLACKAMAS | ) | |

I, SISTER MARY SLATER, being duly sworn, do hereby state as follows:

1.    I am a Sister of the Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province, a Plaintiff in the above-referenced Action. I make this Affidavit and Verification pursuant to Nev. R. Civ. P. 23.1(b) in connection with the filing of a Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty (the "Complaint");

- 1 -

SWBI_000000052

2.    The Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province currently hold shares of Smith & Wesson Brands, Inc. and have held such shares continuously during all relevant times alleged in the Complaint.

3.    I have reviewed the Complaint and consulted with counsel.

4.    The facts alleged in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

5.    Neither I nor the Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province have received, been promised, or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except (i) such fees, costs, or other payments as the Court expressly approves to be paid to Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province on Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province's behalf; or (ii) reimbursement, paid by the Sisters of the Holy Names of Jesus & Mary, U.S.-Ontario Province's attorneys, of actual and reasonable out-of-pocket expenses incurred by me directly in connection with prosecution of this action.

I make this Affidavit and Verification under penalty of perjury that the foregoing is true and correct.

Executed this _15_ day of _November_ 2023.

_Sister Mary Slater_
SISTER MARY SLATER

SWORN TO AND SUBSCRIBED
before me this _15th_ day of _November_, 2023.

_Kathryn Test_
Notary Public

_July 31, 2027_
My Commission Expires

OFFICIAL SEAL
**KATHRYN F TEST**
NOTARY PUBLIC - OREGON
COMMISSION NO. 1039094
MY COMMISSION EXPIRES JULY 31, 2027

- 2 -

SWBI_000000053

**DISTRICT COURT**
**CLARK COUNTY NEVADA**

ADRIAN DOMINICAN SISTERS, SCHOOL SISTERS OF NOTRE DAME CENTRAL PACIFIC PROVINCE, SISTERS OF BON SECOURS USA, SISTERS OF ST. FRANCIS OF PHILADELPHIA, and SISTERS OF THE HOLY NAMES OF JESUS & MARY, U.S.-ONTARIO PROVINCE, derivatively on behalf of SMITH & WESSON BRANDS, INC.,

        Plaintiff,

     v.

MARK P. SMITH, KEVIN A. MAXWELL, SUSAN J. CUPERO, ROBERT L. SCOTT, ANITA D. BRITT, FRED M. DIAZ, MICHELLE J. LOHMEIER, BARRY M. MONHEIT, and DENIS G. SUGGS,

        Defendants.

    -and-

SMITH & WESSON BRANDS, INC., a Nevada Corporation,

        Nominal Defendant.

Case No:
Dept No:

**AFFIDAVIT AND VERIFICATION**

STATE OF PENNSYLVANIA   )
                    ) ss.
COUNTY OF DELAWARE    )

     I, TOM MCCANEY, being duly sworn, do hereby state as follows:

     1.   I am the Director of Corporate Social Responsibility for the Sisters of St. Francis of Philadelphia, a Plaintiff in the above-referenced Action. I make this Affidavit and Verification pursuant to Nev. R. Civ. P. 23.1(b) in connection with the filing of a Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty (the "Complaint");

- 1 -

SWBI_000000054

2.     The Sisters of St. Francis of Philadelphia currently hold shares of Smith & Wesson Brands, Inc. and have held such shares continuously during all relevant times alleged in the Complaint.

3.     I have reviewed the Complaint and consulted with counsel.

4.     The facts alleged in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

5.     Neither I nor the Sisters of St. Francis of Philadelphia have received, been promised, or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Sisters of St. Francis of Philadelphia on the Sisters of St. Francis of Philadelphia's behalf; or (ii) reimbursement, paid by the Sisters of St. Francis of Philadelphia's attorneys, of actual and reasonable out-of-pocket expenses incurred by me directly in connection with prosecution of this action.

I make this Affidavit and Verification under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of November, 2023.

_____
TOM MCCANEY

SWORN TO AND SUBSCRIBED
before me this 6th day of November, 2023.

Susanna V Monteleone
Notary Public

My Commission Expires

Commonwealth of Pennsylvania - Notary Seal
SUSANNA V MONTELEONE - Notary Public
Delaware County
My Commission Expires December 8, 2026
Commission Number 1259480

- 2 -

SWBI_000000055